UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| WALTON GLOBAL INVESTMENTS, LTD., *et al.*, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. 3:23-cv-00087-REP |
| BOWMAN CONSULTING GROUP, LTD., | ) ) ) |
| Defendant. | ) ) |

## SECOND AMENDED COMPLAINT

Walton Global Investments, Ltd. ("**Walton Global**") and Walton Virginia, LLC ("**Walton Virginia**") (together, the "**Plaintiffs**"), by and through their undersigned counsel, hereby sue Bowman Consulting Group, Ltd. ("**Bowman**") and for a cause of action state:

### Jurisdiction And Venue

1. Walton Global is a corporation formed under the laws of Canada with its principal place of business located in Canada.

2. Walton Virginia is a Virginia limited liability company in good standing. Walton Virginia's sole member is Walton International Group (USA), Inc., which is a corporation formed under the laws of Arizona with its principal place of business located in Arizona. At the time Plaintiffs' cause of action accrued and the damages were suffered (hereinafter, "Times Relevant"), Walton Global owned and controlled Walton Global Holdings, Ltd., which owned and controlled Walton International Group (USA), Inc.[1]

---

[1] In 2021, Walton International Group completed a restructuring. Walton Global Investments, Ltd. (Plaintiff) and Walton International Group (USA), Inc. (parent company to Plaintiff Walton Virginia) are now sister companies with the same parent company, Doherty Real Estate Holdings, Inc. ("Doherty, Inc."), but the claims that accrued in favor of Walton Global, as explained herein, are still owned and controlled by Walton Global and Walton Virginia.

3. Bowman is a corporation formed under the laws of the state of Delaware with its principal place of business located in Virginia.

4. In light of the foregoing, diversity exists as between the Plaintiffs and the Defendant.

5. The amount in controversy exceeds $75,000.  Given this, and the existence of diversity as between the Plaintiffs and the Defendant, this Court has subject matter jurisdiction under 28 U.S.C. §1332 to decide this controversy.

6. Venue in this Court is proper, as the matters in controversy involve transactions and occurrences between the parties in Virginia, concerning real property located in Powhatan County, Virginia and contracted-for services, undertakings, acts and omissions performed/ committed in Powhatan County, Virginia.

## Facts Common To All Counts

7. In April 2018, Walton Global, a national real estate land asset manager & financier specializing in (*inter alia*) the purchase, entitlement and re-sale of developable, residential real estate, was considering whether to purchase a piece of real property comprised of a 74 acre +/- parcel of land (a.k.a. parcel 47-29) in Powhatan County, Virginia (the "**Property**").

8. Walton Global's practice in the U.S. at the time was to pursue real estate development opportunities in individual States, but to purchase (if it did) those State-specific properties through its local sub-subsidiary/affiliate.  In Virginia, that was Walton Virginia.

9. At Times Relevant, Walton Global was parent-owner of both Walton Virginia's owner, Walton International Group (USA), Inc., and of Walton Virginia, twice removed.  Walton Global was, therefore, the parent in the disclosed and understood joint venture/would-be affiliated ownership structure under the hereinafter defined Bowman "Contract," and Bowman

understood that any purchase of the Property under consideration by Walton Global would actually be through its disclosed affiliate and co-venturer, Walton Virginia.

10. The officers and directors of Walton Global are William Doherty (Sole Director and CEO), Kate Kaminski (COO) and John Plastiras (EVP Real Estate). Walton Virginia, a single member LLC, does not have any officers or directors; rather, all consents and resolutions at Times Relevant were executed by its sole member, Walton International Group (USA), Inc. The officers and directors of Walton International Group (USA), Inc., at Times Relevant, were William Doherty (Director & CEO), Siobhan Doherty (Director, VP & Secretary), Ryan Kretschmer (COO, Privacy Officer & EVP Law), Ed Fleming (Vice President), and John Vick (Vice President).

11. Walton Global always intended to take title to the Property (if it did) through its sub-subsidiary, Walton Virginia. Again, Walton Global's business plan in this regard was explained to and well understood by Bowman. Indeed, Bowman insisted that Walton Virginia (the intended third-party beneficiary and co-venturer of Walton Global that would actually purchase the subject Property for Walton Global and itself) also be expressly obligated for the Bowman fee under the hereinafter defined "Contract."[2] Thus, it was known to and acknowledged by both parties – including, but not limited to in the language of the parties' Contract itself -- that Bowman's due diligence services would not be, and were not solely for the

---

[2] *See* **Exhibit 1** hereto, the April 18, 2018 Contract (the "**Contract**") entered into by and between Bowman and Walton Global, at p. 18 of 21. The billing entity is clearly identified as "Walton Virginia, LLC."

intended benefit of Walton Global, but also for its disclosed sub-subsidiary and co-venturer, Walton Virginia.[3]

12. To assist with a due diligence feasibility study and concept plan for the Property, and to distill a reasonable projection of the net development potential for the subject Property under state and local regulations and restrictions regarding same, Walton Global (for its benefit and for the benefit of and on behalf of its disclosed joint venture with its sub-subsidiary and co-venturer, Walton Virginia), engaged Bowman by written contract – entered into on or about April 18, 2018 (the Contract). *See* Exhibit 1.

13. Bowman's analyses were intended to inform the Walton Global/Walton Virginia joint venture's understanding of the residential and other development potential for the subject Property and to help Walton Global decide, on behalf of and through its joint venture with Walton Virginia, whether to waive its feasibility study contingency and go firm on a contract to purchase the subject Property (for the known and intended benefit of Walton Global and Walton Virginia).

---

[3] The said Contract contains multiple references to "affiliates" of Walton Global. Exhibit 1 at p. 10 of 21 (¶ 4) ["…the parties intend that the Retainer be applied to the final invoice for the services described in the Agreement, or against any other unpaid amounts owed to BCG should Client (*or any affiliate of the Client*) fail to timely pay invoices due BCG"] (emphasis added); *see also id*. at p. 14 of 21 (¶ 18) ("This Agreement is solely for the benefit of the parties hereto and, to the extent provided herein, *their respective affiliates*, directors, officers, employees, agents and representatives") (emphasis added). The Contract also contains multiple references to entities claiming "through" Walton Global. Exhibit 1 at p. 11 of 21 [¶7(b)] ("Notwithstanding any other provision of this Agreement, the total liability, in the aggregate, of BCG and BCG's officers, directors, partners, employees, agents, and consultants to Client *and anyone claiming through Client*, shall not in any manner whatsoever exceed the direct losses incurred by Client...") (emphasis added); *see also id*. at p. 11 of 21, [¶ 7(c)] ("To the fullest extent permitted by law, BCG and BCG's officers, directors, partners, employees, agents, and sub-consultants shall not be liable to Client *or anyone claiming through Client* for any special, incidental, indirect, or consequential damages whatsoever...") (emphasis added).

14.     Walton Virginia subsequently contracted on behalf of the disclosed joint venture to purchase the subject Property on or about April 25, 2018 (said contingent contract to purchase the Property hereinafter the "**PSA**") – within days after Walton Global's contracting (on its own behalf, and also for the intended benefit of its disclosed co-venturer, Walton Virginia) with Bowman – but expressly reserved to Walton Virginia (as contract purchaser) a 60-day feasibility study period before Walton Virginia was required to go firm on the PSA and (*inter alia*) put at risk whatever deposit money was required to be paid under the PSA.

15.     On June 12, 2018, Bowman – bound by contract and holding itself out as a licensed expert in such matters – provided Plaintiffs (for the benefit of Walton Global, and for its co-venturer Walton Virginia's benefit) a written Due Diligence Report and Concept Plan, pursuant to the Contract, but addressed to "Walton®," further indicating that Bowman's consultant services were for the intended benefit of both Walton Virginia and Walton Global.[4]

16.     The June 2018 Due Diligence report was, on its face, "Prepared for Walton®" -- *i.e.*, the Walton parent Walton Global, and whatever affiliates through which it would structure any acquisition.  Walton Virginia had hired Bowman in the past, and Bowman had previously

---

[4]     As explained herein, it was always Walton Global and Walton Virginia's intent to share the risks and potential gains of the joint venture that existed between them with respect to the Contract and Property.  Although they do not concede it was necessary in light of the facts stated herein and in this lawsuit, Walton Global and Walton Virginia nevertheless also executed the "Mutual Confirmatory Acknowledgment and Assignment of Claims/Chose In Action" attached hereto as **Exhibit 2** (the "**Confirmatory Assignment**") to eliminate and moot any potential question (not admitted) that both plaintiffs herein, as a matter of fact and and law, jointly own and control the meritorious claims asserted herein against Bowman, both with respect to privity of contract/standing to sue, and joint recourse for the damages caused by Bowman's breach, and to further confirm and evidence Walton Global's and Walton Virginia's always-intended rights with respect to Bowman, the Contract, and the Property.  Note that the Confirmatory Assignment is not an assignment of the Contract itself.  Rather, as evidenced by its terms, the Confirmatory Assignment confirms the mutual/cross assignments of the right to assert any claim or chose in action that the Plaintiffs each may have as against Bowman.

5

dealt with both Walton Virginia and its affiliate parent company Walton Global. Thus, Bowman certainly knew of this preferred Walton® deal structure at all Times Relevant. Indeed, this was Walton Global's standard operating procedure at Times Relevant; *viz.,* to arrange for funding of purchases and to run the deal, but to actually purchase State-specific properties through its local sub-subsidiary/affiliates, pursuant to the Joint Venture deal structure described herein.

17. Consistent with the mutual intent that Walton Virginia (and the disclosed joint venture) be intended Contract beneficiaries (with recourse), prior to delivery of the Due Diligence Report Walton Global directed Bowman to certify the ALTA survey that Bowman prepared as part of its due diligence services to Walton Virginia, instead of to Walton Global.

18. On June 1, 2018, prior to its delivery of the final Due Diligence Report, Bowman delivered an ALTA survey that Bowman prepared to Walton Global. That same day, Walton Global directed Bowman to certify the survey to Walton Virginia (the disclosed would-be purchaser of the property), instead of Walton Global.

19. On June 12, 2018 Bowman delivered a revised ALTA survey certified to Walton Virginia. On the same day, Bowman delivered a revised Due Diligence Report. Thus, Bowman also had actual notice in this way, consistent with the understanding *ab initio*, of Walton Virginia's status as intended beneficiary and co-user of the Due Diligence Report and other studies (*e.g.*, Concept Plan) prepared by Bowman.

20. The documents provided by Bowman included Bowman's analysis and professional opinions, as an expert in local entitlement and development of real estate, of what the current development potential of the Property supposedly was, and what was likely feasible in Powhatan County at that time (and for the foreseeable future) as a would-be entitlement and development plan for the Property, including but not limited to the Property's potential for up-

6

zoning under the then-current County comprehensive zoning planning for the Property. Those documents were all delivered by Bowman with the express and mutually understood purpose of helping inform Walton Global's decision (for it and its intended third-party beneficiary and co-venturer, Walton Virginia), whether to go forward with its as-planned purchase and government entitlement process for the Property.

21. Bowman's projected planning for supposedly feasible development of the Property erroneously analyzed the development potential and risk profile for the Property because it (*inter alia*) did not include any analysis of restrictive "proffers" of record which then encumbered the subject Property (the "**Subject Proffers**"). Despite that, Bowman expressly opined and (erroneously) assured Walton Global – for itself and for its disclosed co-venturer and intended third-party beneficiary, Walton Virginia – that no such restrictive proffers encumbered the Property or would otherwise adversely impact the development/entitlement potential of the Property. In fact, many restrictive proffers of record (*i.e.,* the Subject Proffers) were indeed on accessible record with the County and did indeed encumber the Property (and which constituted a substantial pre-existing constraint continuing to restrict the Property's potential, unless negotiated away or modified in a successful future up-zoning of the Property – which could not be certain, in material part, because of the existence of the Subject Proffers). Despite public, and readily available information on record with the County, the Subject Proffers were not discovered or disclosed by Bowman in its (accordingly) flawed feasibility projections and Concept Plan.

22. As a result, the Bowman Due Diligence Report and Concept Plan documentation (including with respect to supposed "net developable land") erroneously assumes the baseline restrictions applicable to the Property (without the Subject Proffers) and erroneously projects

7

(*inter alia*) that "…the County should be amenable to rezoning to Village Residential" -- which is substantially more supposedly feasible development for the subject Property than could reliably be projected in fact, due to the undisclosed Subject Proffers.  That was substantially due to the negative effect those Subject Proffers would likely cause on any effort to increase the development potential and density for the subject Property via the anticipated up-zoning (always Walton Global's and Walton Virginia's joint business plan for the Property, if feasible) despite what Bowman insisted was called for in the then-applicable comprehensive planning for the Property.

23. Bowman's Due Diligence Report and Concept Plan were all oblivious to the undisclosed Subject Proffers (and in turn also lacked any disclosures with respect to certain wetlands/stream areas precluding/limiting Walton's projected feasibility decisions, which were also accurately described in the undisclosed Subject Proffers).  Those Subject Proffers, *inter alia*, expressly limit residential development of the Property to 10 large acreage single-family residential lots – in stark contrast to the several hundred single and multi-family units described and depicted in the Bowman Due Diligence Report and Concept Plan – and were, accordingly, factually wrong, unreliable in fact, incomplete in scope and negligently rendered.  All of the foregoing was in violation of Bowman's contractual and professional undertakings and applicable professional standards of care governing same.

24. In good faith and reasonable reliance on Bowman's false and misinformed opinions with respect to the Property's entitlement/development feasibility, Walton Global, through its disclosed affiliate and co-venturer, Walton Virginia, waived feasibility and went firm on the PSA, and thereafter proceeded to closing on the subject Property in July 2018.

25. In order to fund the purchase of the Property Walton Global raised cash from investors. This purchase money was deposited directly into the Walton Virginia bank account, and once Walton Virginia closed on the Property, any remaining cash was transferred to Walton International Group (USA), Inc., Walton Virginia's single member (another affiliate of Walton Global at Times Relevant) and direct parent company. This cash was to be used by the joint venture for future planning and entitlement expenses, as well as any operating and administrative expenses of the joint venture.

26. Any gross profit from the joint venture was first to be used to pay the cost of operations of Walton Virginia and its single member, Walton International Group (USA), Inc., with any net profit from operations being passed through to Walton Virginia's member, and its member owner entities, including Walton Global.

27. The profits and losses of the Walton Global/Walton Virginia joint venture are shared within the venture; any profit the joint venture would have made (had the Property been worth what Bowman erroneously opined it was) and any capital gains devolving from the investment would have been shared by the joint venture as a whole – not just by Walton Global or Walton Virginia singularly.

28. Walton Global, as the parent company of Walton Virginia [through Walton Global's ownership of Walton Virginia's parent company, Walton International Group (USA), Inc.], would not have had the cash from this transaction in its bank account; rather, Walton Global would have recognized the revenues from this transaction on its financial statements. Walton Global consolidated all revenues from its United States subsidiary companies, including Walton International Group (USA), Inc. and Walton Virginia, in its financials.

29. It was always understood by Bowman – from this and at least one prior engagement by Walton Virginia, and from understanding the aforesaid Walton Global business model and its specific plan for the subject Property – that an intended third-party beneficiary and co-venturer; here, specifically, Walton Virginia, would take legal title to the Property (for itself and for its disclosed beneficial owner, Walton Global), but also that any decision whether to purchase would be directed, and funding for same arranged, by Walton Virginia's disclosed parent, Walton Global. The aforesaid Walton Global business model clearly meets the common law definition of a "joint venture" (vertical co-owners in business for-profit, albeit via lawfully separated and formal parent and affiliate entities), despite that only the local/disclosed affiliate took title.[5]

30. Bowman's reporting (always intended and known to be for the benefit of the joint venture between Walton Global and Walton Virginia) opined that the subject Property (which was then subject to three different zoning classifications) was likely to be approved as supposedly called for in the applicable comprehensive plan (for the local zoning and land use district) for up-zoning to so-called "Village Residential," with (*inter alia*) up to 4 units of density per acre. Indeed, that was the assumption in Bowman's Concept Plan, depicting hundreds of single family (attached and detached) and multifamily units as supposedly feasible. However, the existence of the Subject Proffers substantially changed the risk profile for the Property and drastically reduced the market value of the Property for any reasonably prudent and

---

[5] Again, and in telling recognition of their joint and several, intended beneficiary (with recourse) status, as part of the Contract terms Bowman insisted that Walton Virginia (the known local Walton Global affiliate/sub-subsidiary of Walton Global, which both parties knew would take title of the Property at closing) expressly agree to be responsible for Bowman's fees and also acknowledged, expressly, that others (*e.g.*, Walton Virginia) could claim "through" Walton Global and have direct recourse/redress for any breach damages against Bowman. See Contract references at footnote 2, *supra*.

10

knowledgeable buyer (like Plaintiffs sought to be through Bowman) looking to purchase the land for that supposed up-zoning potential. Bowman always knew that was Walton Global and Walton Virginia's business plan, and Bowman expressly undertook to provide expert advice for both of their intended benefit and to help Walton Global and Walton Virginia decide whether to go forward with the project, starting with Walton Global (through Walton Virginia) waiving feasibility under the PSA and paying the purchase price at closing on the Property.

31. Even so, Bowman breached the Contract by negligently failing, in violation of the contractually undertaken standard of care, to discover and disclose the Subject Proffers (including certain wetlands/stream areas, also described in the Subject Proffers but not discovered or disclosed by Bowman), let alone include them in its analysis for Walton Global and Walton Virginia, upon which Bowman knew each would be relying, and did so in fact. Those proffers were essential information to know in trying to appreciate the risk/benefit calculus for Walton Global, just as they would be for any informed residential developer/purchaser, like Walton Global sought to be in hiring and relying on Bowman's professional opinions.

32. As was always the stated plan if Bowman's reporting regarding potential up-zoning for the Property proved favorable, Walton Global – in reasonable reliance on its fee professional consultant's expert analysis and projections – through and with its co-venturer Walton Virginia, purchased the Property, with Walton Global arranging for the funding of the purchase price at closing. In so doing, the Plaintiffs reasonably believed that due to its favorable chances for up-zoning, as reported by Bowman (and without any detrimental proffers), the Property was worth probably more, but not less than approximately $6,607,000 (actually $13,437,500 under Bowman's flawed Concept Plan, but the lower number also applies an overly

conservative 50.1% probability of up-zoning per Bowman's written opinion regarding what the County authorities "should be amenable to," while Bowman's other interactions with Walton in this regard and the Concept Plan were, if anything, even more enthusiastic about Walton's likelihood of a successful up-zoning). However, based upon the undisclosed Subject Proffers (and wetlands they also disclose), the Property was in fact worth much less. Therefore, and had they been properly described and timely disclosed to Walton by its fee professional, Bowman, *the Walton joint venture would never have purchased the subject Property*.

33. Indeed, and based upon the late-discovered (and undisclosed by Bowman) information concerning the Subject Proffers (and the wetlands expressly delineated therein), as well as the prejudicial effect that the Subject Proffers would have likely had on the Property for purposes of any potential upzoning described in Bowman's reporting [and notwithstanding Powhatan County's then comprehensive planning recommendation for upzoning the subject Property to Village Residential (and/or, worst case, Village Center)] – the actual fair market value of the Property to a reasonably prudent and properly informed residential developer at the time of Bowman's breach and Walton Virginia's (understood and intended) closing on the Property was, at most, only slightly more than the $1,150,000 paid in fact at closing – resulting in likely more, but not less than approximately $5,157,000 in compensable, benefit of the bargain, direct breach damages.

**Count I**
**(Breach of Contract/Professional Negligence –**
**Third Party Beneficiary and Joint Claim Ownership)**

34. Plaintiffs incorporate the foregoing factual allegations as though fully set forth.

35. Under the written Contract between Bowman and Walton Global, and applicable law (given the nature of Bowman's undertaking), Bowman, as a fee professional engineering

12

firm and holding itself as an expert in real property entitlement and development feasibility in Powhatan County, Virginia, owed both Walton Global, and Walton Virginia (as a disclosed and intended beneficiary of the Bowman undertaking pursuant to the Contract, as outlined above), a contract duty of due care equal to that owed by a reasonably prudent fee professional in the same profession, both as set forth in the Contract and otherwise. So too, and pursuant to the expedient Confirmatory Assignment (Exhibit 2), the instant breach of contract, reliance damage claim is jointly owned by the Plaintiffs, both with regard to standing to sue/privity and redress for the damages alleged herein.

36. Bowman breached those legal duties by, *inter alia*, failing to discover and timely disclose the existence of the Subject Proffers (existence and scope of certain existing wetlands/stream areas inclusive), which disclosure was necessary for any reasonable, reliable and correct understanding of the development and entitlement potential of the Property. That was an expressly understood and agreed purpose of Bowman's engagement and for the professional services it undertook to provide, for the intended benefit of both Walton Global and Walton Virginia, jointly, each with standing to sue Bowman (*albeit* for a single recovery between them) – Walton Global as the contracting party, and Walton Virginia as the known affiliated entity through which Walton Global would purchase the Property and intended third-party beneficiary. *See* also footnote 4, *supra*, and Exhibit 2 regarding joint ownership of these breach of contract claims.

37. The foregoing failure to timely discover and disclose (and material misrepresentations regarding the supposed absence of) the Subject Proffers and wetlands/stream areas occurred while Bowman was under contract/professional duty to discover and disclose the subject Proffers and Property conditions, both to Walton Global (as Contract party and parent

owner of Walton Virginia's owner) and to Walton Virginia, as intended beneficiary and future owner, through which Bowman understood Walton Global intended to purchase and entitle the Property. *Accord*, Exhibit 2.

38. Bowman knew both Walton Global and Walton Virginia would rely on Bowman's reporting regarding the development potential of the Property, which both Walton Global and Walton Virginia reasonably did. Had Bowman acted prudently in regard to those undertakings (including the foregoing negligent failures to discover and disclose, and negligent misrepresentations regarding the supposed absence of the undisclosed proffers and extent of wetlands/stream areas) and otherwise met its contractual obligations, then the Plaintiffs would not have closed on the Property and/or otherwise suffered the damages complained of.

39. As a direct and proximate result of Bowman's breach of the applicable standards of care assumed by Bowman in the Contract and under the attendant circumstances and its professional obligations, including Bowman's failure to timely discover and disclose the Subject Proffers and in falsely and negligently opining with respect to development potential of the Property without factoring in the Subject Proffers (including the corresponding wetlands/stream area information in those proffers), both of the Plaintiffs suffered compensable money damages, with recourse – Walton Global as the contracting party, and Walton Virginia as purchaser and intended Contract beneficiary. *See also* footnote 4 and Exhibit 2.

40. Because the false inducements in Bowman's faulty and incomplete reporting regarding the supposed development potential of the Property were provided as a fee-professional, pursuant to the Contract, and were intended to inform the Plaintiffs' decision to close and fund the purchase, Plaintiffs are jointly entitled to the aforesaid "benefit of the bargain" measure of damages.

41. Under applicable Virginia law, in a non-defaulting plaintiff, versus fee expert consultant context like this (and under the facts of this case), damages should also be measured not later than the time of Plaintiffs' reliance-based purchase of the Property, and include direct damages equal to Plaintiffs' lost benefit of the bargain. In short, Plaintiffs have been damaged in this case to the extent of not less than the difference between (i) the Property's fair market value, as and if it had been as represented and opined by Bowman in its reporting under the Contract, and (ii) the Property's actual value with the Subject Proffers (and the full extent of wetlands/ stream areas, which the Subject Proffers also disclosed), which Bowman failed to timely discover and explain to the Plaintiffs.

42. All applicable notices were timely given and all conditions precedent to suit were timely satisfied under the subject Contract. Plaintiffs acted with appropriate due care and diligence at all times relevant.

WHEREFORE, Plaintiffs Walton Global Investments, Ltd. and Walton Virginia, LLC, jointly and severally, demand judgment (but for a single recovery) against Defendant Bowman Consulting Group, Ltd. on Count I in the amount to be proved at trial, but in excess of $75,000 (exclusive of costs), plus prejudgment interest from not later than the date of closing, and an appropriate award of costs and post-judgment interest from the date of judgment.

### Count II
### (Breach of Contract/Professional Negligence – Joint Venture And Joint Claim Ownership)
### (In The Alternative)

43. Plaintiffs incorporate the foregoing factual allegations as though fully set forth.

44. Under the written Contract between Bowman and Walton Global and applicable law, Bowman, as a fee professional engineering firm and holding itself as an expert in real property development feasibility in Powhatan County, Virginia, owed both Walton Global and

Walton Virginia, as a disclosed co-venturers as outlined above, a contract duty of due care equal to that owed by a reasonably prudent fee professional in the same profession, both as set forth in the Contract and otherwise. So too, and pursuant to the expedient Confirmatory Assignment (Exhibit 2), the instant breach of contract, reliance damage claim is jointly owned by the Plaintiffs, both with regard to standing to sue/privity and redress for the damages alleged herein.

45. Bowman breached those legal duties by failing to discover and disclose the existence of the Subject Proffers (including the existence and scope of certain wetlands/stream areas), which disclosure was necessary for any reasonable, reliable and correct understanding of the development potential of the Property. It was the expressly understood and agreed purpose of Bowman's engagement and for the professional services it undertook to provide, for the intended benefit of both Walton Global and Walton Virginia, jointly and severally, as co-joint venturers in the purchase, development, and ultimate resale of the Property.

46. Bowman knew and intended that the co-venturers/parent-sub-subsidiary Walton Global and Walton Virginia would rely on Bowman's reporting on the Property, which both Walton Global and Walton Virginia reasonably did, to their joint and several detriment. Had Bowman acted prudently in regard to its undertaking (by discovering and disclosing the existence of the Subject Proffers and related wetlands/stream areas), then the Plaintiffs would not have closed on the Property and/or otherwise suffered the damages complained of.

47. As a direct and proximate result of Bowman's breach of the applicable standards of care assumed by Bowman in the Contract and under the attendant circumstances and its professional obligations, including Bowman's failure to timely discover and disclose the Subject Proffers and in falsely and negligently opining with respect to entitlement and development potential of the Property without factoring in the Subject Proffers (including the corresponding

wetlands/stream area information in those proffers), both of the Plaintiffs suffered compensable money damages, jointly (and for a single recovery between them) – and as disclosed and understood co-venturers with recourse. *Accord*, footnote 4, *supra*, and Exhibit 2 regarding joint claim ownership.

48. Because Bowman's faulty reporting regarding the development potential of the Property was provided as a fee-professional, pursuant to the Contract, and was intended to inform the Plaintiffs' decision to close and fund the purchase, Plaintiffs are entitled to their "benefit of the bargain" measure of damages.

49. Under applicable Virginia law, in a non-defaulting plaintiff, versus fee expert consultant context like this damages should be measured not later than the time of Plaintiffs' reliance-based purchase of the Property, and include direct damages equal to Plaintiffs' lost benefit of the bargain. In short, Plaintiffs have been damaged in this case to the extent of not less than the difference between (i) the Property's fair market value, as and if it had been as represented and opined by Bowman in its reporting under the Contract, and (ii) the Property's actual value with the Subject Proffers (and the full extent of wetlands/stream areas, which the Subject Proffers also disclosed), which Bowman failed to timely discover and explain to the Plaintiffs.

50. All applicable notices were timely given and all conditions precedent to suit were timely satisfied under the subject Contract. Plaintiffs acted with appropriate due care and diligence at all times relevant.

WHEREFORE, Plaintiffs Walton Global Investments, Ltd. and Walton Virginia, LLC, jointly and severally, demand judgment (but for a single recovery) against Defendant Bowman Consulting Group, Ltd. on Count II in the amount to be proved at trial, but in excess of $75,000

(exclusive of costs), plus prejudgment interest from not later than the date of closing, and an appropriate award of costs and post-judgment interest from the date of judgment.

                                               Respectfully submitted,

                                               /s/ William F. Gibson II
                                             William F. Gibson II (VA Bar No. 45397)
                                             wgibson@shulmanrogers.com
                                             Kevin P. Kennedy (*pro hac vice*)
                                             kkennedy@shulmanrogers.com
                                             SHULMAN, ROGERS, GANDAL, PORDY
                                                 & ECKER, P.A.
                                             12505 Park Potomac Avenue, 6th Floor
                                            Potomac, Maryland, 20854
                                            (301) 230-5200; (301) 230-2891 (fax)
                                            *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 8, 2024, a true and correct copy of the foregoing was served, via the Court's online system, upon:

                         Stephan F. (Hobie) Andrews, Esq.
                         Katherine M. Rockwell, Esq.
                         Melisa Azak, Esq.
                         O'HAGAN MEYER, PLLC
                         411 E. Franklin Street, Suite 500
                         Richmond, VA 23219

                                             /s/ William F. Gibson II
                                             William F. Gibson II